UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

GARY LEE GROSS,

                 Plaintiff,

       v.

MICHAEL J. ASTRUE,[1]
COMMISSIONER OF SOCIAL SECURITY,

               Defendant.

_____

DECISION & ORDER

12-CV-6207P

## PRELIMINARY STATEMENT

Plaintiff Gary Lee Gross ("Gross") brings this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social Security (the "Commissioner") denying his application for Supplemental Security Income ("SSI"). Pursuant to 28 U.S.C. § 636(c), the parties have consented to the disposition of this case by a United States magistrate judge. (Docket # 15).

Currently before the Court are the parties' motions for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (Docket ## 11, 12). For the reasons set forth below, this Court finds that the decision of the Commissioner is not supported by substantial evidence in the record. Accordingly, the Commissioner's decision is vacated, and this claim is remanded for further administrative proceedings consistent with this decision.

_____

[1] After the commencement of this action, on February 14, 2013, Carolyn W. Colvin became Acting Commissioner of Social Security.

**BACKGROUND**

I.   **Procedural Background**

Gross applied for benefits on March 13, 2009, alleging he had been disabled since March 8, 2009 due to degenerative disc disease, back injury and depression.  (Tr. 176-82, 211).[2] On August 18, 2009, the Social Security Administration denied Gross's claim for disability benefits, finding that he was not disabled.  (Tr. 71).  Gross requested and was granted a hearing before Administrative Law Judge Susan Wakshul (the "ALJ").  (Tr. 79, 93, 111-15).  The ALJ conducted a video conference hearing on August 30, 2010.  (Tr. 27, 29).  Gross was represented at the hearing by his attorney, Kelly Laga, Esq.  (Tr. 29, 92).  In a decision dated September 23, 2010, the ALJ found that Gross was not disabled and thus was not entitled to benefits.  (Tr. 14-22).  On February 23, 2012, the Appeals Council denied Gross's request for review of the ALJ's decision.  (Tr. 1-4).  Gross commenced this action on April 18, 2012 seeking review of the Commissioner's decision.  (Docket # 1).

II.   **Non-Medical Evidence**

A.   **Gross's Application for Benefits**

Gross was born on March 17, 1962 and is now 52 years old.  (Tr. 471).  Gross attended high school in a regular class setting through the tenth grade, when he dropped out.  (*Id.*).  Gross served in the Navy from 1979 through 1980 and was honorably discharged.  (Tr. 473).  Gross subsequently obtained his GED in 1982.  (Tr. 471).

---

[2]  The administrative transcript shall be referred to as "Tr. __."

Gross's previous work history includes employment as a telemarketer, food service employee, delivery truck driver, taxi driver, dispatcher and officer manager.  (Tr. 35-38). From approximately 1995 through 2000, Gross worked in the food service industry, first as a cook, then as a kitchen manager and finally as an assistant manager.  (Tr. 35-38, 197, 282). Gross was also employed as a telemarketer for approximately six months.  (*Id.*).  From approximately May 2000 through July 2001, Gross was employed as a delivery truck driver refilling vending machines.  (Tr. 282).  During the period July 2001 to March 2008, Gross was employed in the taxicab industry.  (*Id.*).  Initially, Gross drove the cabs.  Gross later worked as a dispatcher and then as an office manager.  (Tr. 197).  As an office manager, Gross's responsibilities included dispatching taxicabs, coordinating pickup and drop off times, billing, and handling customer and client calls.  (Tr. 226).  According to Gross, his duties required him to stand approximately half an hour per day and to sit approximately seven and a half hours per day. (Tr. 227).  The job required very limited climbing, stooping, kneeling, crouching, or crawling. (*Id.*).  During a typical workday, Gross was required occasionally to lift fifty pounds and frequently to lift ten pounds.  (*Id.*).  According to Gross, he stopped working in 2008 because his frequent absences were interfering with his job responsibilities.  (Tr. 35).  He has not worked since March 2008.  (Tr. 35, 171).

When Gross applied for disability benefits, he lived with his wife and two children.  (Tr. 186).  Gross reported that his daily activities included eating breakfast, attending appointments with his doctors and physical therapist, watching television and using the computer.  (Tr. 187).  According to Gross, he feeds the family pets with assistance from his wife and children and can perform light household cleaning.  (Tr. 187, 189).  Gross's wife does the

3

majority of the shopping and cooking, although Gross is able to make simple meals for lunch.
(Tr. 188, 190).  Gross leaves the house primarily to attend medical appointments or physical
therapy.  (Tr. 189).

According to Gross, prior to the onset of his reported disabilities, he was able to
perform household tasks like cleaning and cooking, but is unable to do so now due to his
inability to sit or stand for extended periods.  (Tr. 187).  In addition, Gross reports that he can no
longer ride a bicycle, play sports, lift heavy objects or go bowling – limitations that have caused
him to lose friends.  (Tr. 187, 191).  Gross's impairments also interrupt his sleep, and he
currently sleeps for approximately two to three hours at a time.  (Tr. 187).

Gross reports that he needs reminders to take his medications, but is able to pay
bills, handle a savings account and use a checkbook.  (Tr. 188, 190).  According to Gross, he
reads, watches television and uses the computer daily, but easily loses interest.  (*Id.*).  Since the
onset of his impairments, he has experienced increased irritability, is argumentative and has
difficulty remaining focused.  (Tr. 192).  Gross reports that his impairments have resulted in
depression and he worries that they are adversely affecting his relationship with his family.  (Tr.
193).

Gross's impairments have limited his ability to walk, and he uses a cane for
assistance.  (Tr. 192).  According to Gross, he experiences a constant ache in his right hip, both
knees, both ankles and his lower back.  (Tr. 194).  Gross reports that sitting, walking, lying down
and bending exacerbate his pain.  (Tr. 195).  At the time he filed for disability, Gross was not
taking medication to manage the pain because his prescription had run out.  (*Id.*).

After the initial denial of benefits, Gross supplemented his disability application on August 26, 2009.  (Tr. 242-51).  According to that application, he experienced deepening depression, which caused his physician to modify his medication.  (Tr. 243).  In addition, Gross began attending Alcoholics Anonymous due to his worsening depression.  (*Id.*).  Gross reported that he was undergoing testing for lupus, a possible heart condition and joint disease.  (*Id.*).  Gross's physical limitations have become more severe and he now requires a shower chair and a quad cane.  (*Id.*).  According to Gross, he needs assistance when taking a shower and dressing.  (Tr. 250).  Further, Gross no longer assists with any household chores, nor drives because he experiences dizzy spells and blurred vision.  (*Id.*).

B.      **The Disability Analyst's RFC Assessment**

On July 29, 2009, disability analyst E. Sousa ("Sousa") completed a physical residual functional capacity ("RFC") assessment.  (Tr. 477-82).  Sousa opined that Gross could occasionally lift twenty pounds and frequently lift ten pounds.  According to Sousa, Gross could stand or sit for six hours during an eight-hour workday and had no limitations in his ability to push or pull.  (Tr. 478).  In addition, Sousa opined that Gross could occasionally climb ladders, ropes or scaffolds and could occasionally balance, stoop, kneel, crouch and crawl.  Finally, Sousa noted that Gross had no manipulative, visual, environmental or communicative limitations.  (Tr. 480).  Based upon this assessment of Gross's limitations, Sousa opined that Gross retained the ability to perform light work.  (Tr. 479).

III.   **Medical Evidence**

Gross was in a motor vehicle accident in 1991 and has experienced degenerative disc or joint disease since that event.  (Tr. 518).  Between 1992 and the latter part of 2006, Gross's medical records primarily reflect emergency room visits relating to back and hip problems.  (Tr. 330-62).  In August 1991, Gross visited the Mercy Medical Center complaining of pain in his right hip.  (Tr. 358, 360).  Gross reported an inability to put pressure upon his right hip and difficulty walking.  (Tr. 358).  An examination and x-ray of the hip were negative for fractures or calcium build-up.  (Tr. 358, 360).

In September 1998, Gross visited the emergency department at the Genesee Hospital complaining of lower back pain and muscle spasms.  (Tr. 331).  Gross was prescribed ibuprofen and valium and was given a note to excuse him from work for one week.  (Tr. 331-32).  On July 4, 2000, Gross visited the Bristol Regional Medical Center ("Bristol") complaining of a pulled back muscle.  (Tr. 352).  According to Gross, he had injured his back while attempting to move a refrigerator.  (*Id.*).  Gross reported pain in his back and his right hip, along with pain and numbness in his legs.  (*Id.*).  Gross was prescribed medication and instructed to follow-up with his personal physician if the symptoms did not resolve.  (*Id.*).

Approximately one and one-half months later, Gross returned to Bristol complaining of a right ankle injury.  (Tr. 351).  Gross reported that he had injured his ankle while playing basketball.  (*Id.*).  Gross was prescribed motrin and was instructed to use crutches and ice and to follow-up with his primary physician if the symptoms persisted.  (*Id.*).  The following morning, Gross returned to have his ankle re-checked and for x-rays.  (Tr. 349).  The x-rays were negative for fractures.  (Tr. 350).  Approximately four months later, on December 18, 2009,

Gross reportedly re-injured his ankle when he slipped on ice.  (Tr. 347).  Again, x-rays were negative for a fracture, and Gross was prescribed ibuprofen and instructed to rest, ice and elevate his ankle.  (*Id.*).

In January 2001, Gross returned to Bristol reporting of chest pain.  (Tr. 339).  After a series of tests, including blood work and chest x-rays, Gross was instructed to take Mylanta and Zantac and to follow-up with his primary care physician.  (Tr. 341-45).  Finally, on July 3, 2001, Gross returned to Bristol with complaints of pain in his back and right leg.[3]  (Tr. 337).

On November 15, 2006, Gross began treatment at Highland Family Medicine.[4] (Tr. 321).  During that visit, Gross reported that he had not received medical care for the past seven years because he did not have medical insurance.  (*Id.*).  Gross reported that he had suffered back pain for many years.  (*Id.*).  Gross also expressed concern regarding his cholesterol, blood pressure and his weight.  (*Id.*).  The treatment plan addressed hypertension, hyperlipidemia, morbid obesity and dietary education.  (*Id.*).  With respect to Gross's history of back pain, his previous treatment records were requested and he was instructed to follow-up with his primary care physician, Dr. Lois Vantol ("Vantol").  (Tr. 316, 322).  Gross returned for two appointments in November 2006 in order to follow-up on his lab results.  (Tr. 318-320).  During his visit on November 29, 2006, Gross reported that his back had "slipped out" over the weekend, which caused him to miss a day of work.  (Tr. 318).  Gross was instructed to continue

---

[3]  The notes for this visit are mostly illegible.

[4]  The transcript contains notes from Strong Memorial Hospital and Highland Family Medicine.  (Tr. 300-329, 379-422).  The two sets of treatment notes are virtually identical in substance.  (*Compare* Exhibit 2F *with* 9F).

with his hypertension medication and dietary modifications.  (*Id.*).  In addition, smoking cessation was discussed.  (*Id.*).

During his next appointment on December 20, 2006, Gross reported that he was going to physical therapy for his back pain.  (Tr. 317).  According to Gross, he believed that he had overworked himself during his physical therapy session, resulting in pain radiating to his hip and leg.  (*Id.*).  Gross's hypertension appeared to be controlled by medication, and he was instructed to continue his weight loss and smoking cessation attempts.  (*Id.*).

Gross's next appointment with Vantol was on March 9, 2007.  (Tr. 316).  The purpose of the visit was to refill his prescriptions and to follow-up on his back pain.  (*Id.*).  Gross reported that he had been performing physical therapy exercises at home and had not experienced any significant back pain since his last appointment.  (*Id.*).  Gross continued to lose weight and was instructed to try Nicoderm patches and Buproprion to assist him with his efforts to stop smoking.  (*Id.*).

During a July 27, 2007 appointment, Gross reported ongoing chest pain, left arm numbness, a facial droop and garbled speech.  (Tr. 314-15).  Based upon these symptoms, Gross was transported to the Highland Hospital Emergency Department for blood work, monitoring and potential head imaging.  (*Id.*).  He had a follow-up visit at Highland Family Medicine on August 4, 2007.  (Tr. 413-14).  The treatment notes indicate that Gross was diagnosed with Bell's palsy, was placed on steroids, which improved the facial droop symptoms, and did not require any further treatment.  (*Id.*).  Gross's thyroid levels were low and required further testing.  (*Id.*). Gross reported little success in his efforts to quit smoking.  (*Id.*).

Gross's next appointment was on December 3, 2007.  At that time, Gross reported acute back pain.  (Tr. 408-09).  According to Gross, his back pain had worsened over the past three months and had radiated to his left hip.  (*Id.*).  Gross reported that he had recently been laid off from work, which was causing stress and increased tobacco use.  (*Id.*).  In addition, Gross no longer had any insurance coverage.  (*Id.*).  Gross requested a new prescription for his hypertension medication.  (*Id.*).  Gross was instructed to apply heat to his back and to resume his physical therapy stretches to alleviate his back pain.  (*Id.*).

Gross apparently did not receive any treatment for the next seven months.  (Tr. 406-07).  Gross's next appointment was on July 3, 2008, during which he complained to Vantol about back pain that he had been experiencing for the last three months.  (*Id.*).  Gross reported experiencing muscle spasms in his lower back and tingling in his legs if he remained seated for extended periods.  (*Id.*).  Gross reported that an MRI conducted fifteen years earlier revealed degenerative joint disease.  (*Id.*).  According to Gross, in the past his back symptoms had been alleviated with physical therapy.  (*Id.*).  According to Gross, he lost his job because his employer needed someone who could perform physical labor.  (*Id.*).  Gross also reported difficulty sleeping and increased irritability.  (*Id.*).  Vantol prescribed medication for the back pain and ordered x-rays.  (*Id.*).  In addition, Vantol discussed treatment options for Gross's reported depression, but Gross declined treatment.  (*Id.*).  Vantol also ordered a lipid profile to monitor Gross's hyperlipidemia.  (*Id.*).

Gross had a follow-up appointment with Vantol on July 17, 2008.  (Tr. 401-02).  During that appointment, Vantol discussed the results of the back x-rays taken on July 9, 2008.  (Tr. 325-26, 401).  According to the radiology reports, those x-rays revealed mild degenerative

changes in multiple areas of the thoracic spine and moderate degenerative changes at L5-S1.  (Tr. 325-26).  Gross reported that the medications were not relieving his back pain and that he had applied for disability.  (Tr. 401).  Gross indicated that he continued to experience pain in his back and that it radiated to his right leg with occasional numbness or tingling in the entire leg.  (*Id.*).  Vantol ordered an MRI of Gross's back, and opined that Gross needed temporary disability, but was not likely permanently disabled.  (Tr. 402).  Vantol also prescribed Lipitor for hyperlipidemia and recommended that Gross quit smoking.  (*Id.*).  Vantol prescribed Zoloft for his depression.  (*Id.*).

On July 23, 2008, Gross underwent an MRI of his lumbar spine.  (Tr. 399-400).  The MRI revealed posterior central disc herniation at L3-L4 and L4-L5 and mild narrowing of the proximal neural foramina bilaterally at L5-S1 with no significant spinal stenosis.  (Tr. 400).  In addition, there were endplate degenerative changes throughout the lumbar spine.  (*Id.*).  The impression was mild degenerative changes throughout the spine, most prominent from L3-L4 though L5-S1.  (*Id.*).  In addition, the MRI revealed a potential renal cyst.  (*Id.*).

On August 12, 2008, Gross returned to Highland Family Medicine for a follow-up appointment with Vantol.  (Tr. 397-98).  During the visit, Gross told Vantol that he had previously attempted physical therapy for his back pain, but had discontinued after approximately six weeks because it caused increased pain.  (*Id.*).  In addition, Gross reported that he was discouraged about his unemployment.  (*Id.*).  Vantol reviewed the MRI results and referred Gross to physical therapy and VESID for job retraining.  (Tr. 398).  In addition, Vantol referred Gross to behavioral health services ("BHS") for his depression.  (*Id.*).

Gross's next appointment was on August 27, 2008.  (Tr. 395-96).  During that appointment, Gross reported continued back pain that required him to change positions frequently.  According to Gross, his depression was not responding to medication.  (*Id.*).  Vantol prescribed Flexeril for Gross's back and encouraged him to go to physical therapy.  Vantol instructed Gross to continue his medications to treat his depression and Vantol contacted BHS to instruct them to contact Gross.  (*Id.*).

Approximately seven months later, on March 12, 2009, Gross returned to Vantol complaining of low back and hip pain.  (Tr. 393-94).  Gross reported that he did not go to physical therapy or to VESID, expressing his belief that he should be on disability.  (*Id.*).  Gross reported that he was able to perform housework.  (*Id.*).  Gross's hypertension appeared controlled, he continued to take medication and denied any chest pains or shortness of breath.  (*Id.*).  Gross reported drinking approximately four to six beers every night.  (*Id.*).  Vantol noted that Gross had missed his follow-up appointments with her, as well as with BHS and a physical therapist.  (*Id.*).  Gross explained that his mother had been in a nursing home over the previous eight months and had recently passed away.  (*Id.*).  According to Gross, these developments made it difficult for him to manage his appointments.  (*Id.*).  Vantol noted that Gross had gained twenty-one pounds and that he was not interested in quitting smoking.  (*Id.*).  Vantol referred Gross to physical therapy to address his ongoing back pain and to BHS to address his depression.  (*Id.*).  In addition, Vantol referred Gross to Strong Recovery to address his alcohol abuse.  (*Id.*).

On March 31, 2009, Gross had a physical therapy appointment at Strong Health.  (Tr. 369).  During that intake appointment, Gross reported that he had chronic low back pain stemming from a motor vehicle accident several years earlier.  (Tr. 372).  Gross described the

pain as a constant sharp, shooting pain that worsened when sitting, standing or lying.  (*Id.*).

Gross used a cane to ambulate and reported some relief with heat and massage.  (*Id.*).  Gross

attended two additional physical therapy appointments on April 6 and 9, 2009.  (Tr. 370).

On April 21, 2009, Gross had another appointment with Vantol.  (Tr. 388-89).

Gross reported that he continued to have back and hip pain and was experiencing pain in his left

knee.  (Tr. 388).  Gross missed his previous two physical therapy appointments, but intended to

return for additional therapy.  (*Id.*).  Gross requested narcotic medication to manage his pain.

(*Id.*).  According to Gross, he did not contact Strong Recovery, but reported that he had

decreased his alcohol consumption to approximately one beer every other day.  (*Id.*).  Gross

indicated that he still was very depressed.  (*Id.*).  According to Vantol, Gross had not followed-up

on the referral to BHS.  (*Id.*).  Vantol noted that Gross's hypertension was not controlled and thus

increased his dosage of Lisinopril.  (Tr. 389).  Vantol ordered x-rays of Gross's hips and knees,

but did not consider Gross a good candidate for narcotic medication and declined to prescribe

them.  (*Id.*).  Vantol instructed Gross to continue taking Sertraline for his depression and again

referred him to BHS.  (*Id.*).  In addition, Vantol encouraged Gross to quit drinking alcohol and

smoking.  (*Id.*).

On the morning of May 16, 2009, Gross awoke with facial, arm and leg weakness

and numbness on the left side of his body.  (Tr. 427-28).  Gross was admitted to Strong

Memorial Hospital to undergo testing for a possible ischemic infarct.  (*Id.*).  Gross underwent an

MRI of his head and a transthoracic echocardiogram.  (Tr. 428, 434).  The MRI was negative for

ischemic lesions, and the echocardiogram was normal.  (*Id.*).  Upon discharge, he was diagnosed

with transient hemiparesis of unclear etiology.  (Tr. 428).  He was instructed to follow-up with Vantol.  (*Id.*).

On May 22, 2009, x-rays were taken of Gross's hip and knees.  (Tr. 430-34).  The x-ray of the hips revealed mild or minimal tricompartmental degenerative change.  (*Id.*).  Similarly, the x-rays of the knees revealed mild degenerative change.  (*Id.*).

On August 7, 2009, state examiner Dr. Lynn Lambert ("Lambert") conducted a consultative psychiatric evaluation of Gross.  (Tr. 471-76).  During the evaluation, Gross reported that he was unemployed and had left his prior employment due to frequent absences, low frustration tolerance, mood swings and daily alcohol consumption.  (Tr. 471).  He also reported difficulty sleeping and fluctuating appetite.  (Tr. 472).  With respect to his depressive symptoms, Gross reported dysphoric moods, crying spells, loss of interest, concentration disturbance, diminished self esteem, feelings of worthlessness, low energy, psychomotor and emotional agitation, low frustration tolerance and unpredictable mood swings.  (*Id.*).  Regarding his cognitive symptoms, Gross reported difficulty concentrating, poor short term memory and episodic planning difficulties.  (*Id.*).

Gross reported a long term alcohol addiction, particularly during the period from 1982 to 1991 when he was drinking approximately one case of beer a day.  (*Id.*).  According to Gross, he was currently consuming approximately four alcoholic beverages every day.  (*Id.*).  Gross had recently been referred to Strong Memorial Hospital's Outpatient Chemical Dependency Program and anticipated attending outpatient treatment groups three times per week.  (Tr. 472-73).

Gross reported that he had difficulty cooking, shopping and performing household chores due to his short term memory loss, general loss of interest and low energy level. (Tr. 474). According to Gross, he had a good relationship with his wife and children, but did not participate in social activities. (*Id.*). In addition, Gross reported that he no longer engaged in hobbies, particularly reading, due to loss of interest. (*Id.*).

Lambert opined that Gross had fluent speech, coherent and goal-oriented thought processes, anxious and labile affect, dysthmic mood, clear sensorium, intact attention and concentration, mildly impaired memory, and between average and high-average cognitive functioning. (Tr. 473-74). Lambert noted that Gross was able to perform all counting, calculations and serial 3s exercises. (Tr. 474). Lambert assessed that Gross's insight was fair and his judgment was fair to not good as a result of his continued drinking. (*Id.*). According to Lambert, Gross would be moderately challenged to maintain a regular schedule, learn new tasks, perform complex tasks independently, relate adequately with others and appropriately deal with stress. (*Id.*). Lambert opined that the moderate limitations resulted from Gross's daily consumption of alcohol, coupled with his mood instability and fluctuations, low frustration tolerance and stress regulation problems – all of which interfered with his planning and functioning. (*Id.*). According to Lambert, Gross's prognosis was both fair and not good despite his above-average intellect and supportive spouse. (Tr. 476). Lambert opined that his prognosis was inhibited by his long history of active alcoholism and potentially untreated psychiatric mood disorder. (*Id.*).

On August 17, 2009, agency medical consultant Dr. M. Apacible ("Apacible") completed a mental RFC assessment and a Psychiatric Review Technique. (Tr. 483-500).

Apacible concluded that Gross suffered from mood disorder, not otherwise specified, and that

bipolar disorder should be ruled out, but that Gross's impairments did not meet or equal a listed

impairment.  (Tr. 490).  In addition, Apacible determined that Gross suffered from active alcohol

dependence.  (Tr. 495).  Apacible opined that Gross had mild limitations in activities of daily

living and in his ability to maintain concentration, persistence or pace and moderate limitations

in his ability to maintain social functioning.  (Tr. 497).

Apacible concluded that Gross suffered from moderate limitations in his ability to

understand, remember and carry out detailed instructions; maintain attention and concentration

for extended periods; perform activities within a schedule; maintain regular attendance; complete

a normal workday or workweek and perform at a consistent pace without an unreasonable

number of interruptions; respond appropriately to others; and, independently set realistic goals or

make plans.  (Tr. 483-84).  According to Apacible, Gross appeared able to understand, remember

and carry out simple instructions, interact appropriately with others, make simple work-related

decisions and deal with some degree of stress.  (Tr. 485).  Accordingly, Apacible opined that

Gross was able to perform all of the requirements of unskilled or semi-skilled work.  (*Id.*).

On August 25, 2009, based upon Vantol's referral, Gross was examined by Dr.

Mark Mirabelli ("Mirabelli") for an opinion regarding Gross's joint complaints.  (Tr. 518-19).

Upon examination, Mirabelli noted that Gross had a mild limp when walking and was unable to

perform tiptoe or heel walking.  (*Id.*).  In addition, Mirabelli noted that Gross had an intention

tremor caused by either static or intended movements, which was particularly noticeable in both

of his hands.  (*Id.*).  Mirabelli opined that mild osteoarthritis was present, but not likely the cause

of Gross's multiple joint pains.  (*Id.*).  Mirabelli instructed Gross to follow-up as needed with

Vantol. (*Id.*). A few days later, on August 28, 2009, Gross had a follow-up appointment with

Vantol. (Tr. 588-89). During that visit, Gross reported that he was participating in alcohol abuse

treatment at Strong Recovery and had experienced a few episodes of brief, sharp chest pains.

(*Id.*). Gross also indicated that his medications were not relieving his joint pains and that he

continued to have depressive symptoms despite his new prescription for Effexor. (*Id.*). Vantol

referred Gross to a cardiologist to assess the chest pains. (*Id.*).

   On September 1, 2009, Gross was evaluated by Dr. Sandeep Singh ("Singh") at

the Highland Cardiology Clinic. (Tr. 507-09). Singh assessed that Gross had suffered from

atypical chest pains and had multiple cardiac risk factors. (Tr. 508). He recommended a

coronary angiogram and a carotid ultrasound. (Tr. 509). The carotid ultrasound was performed

the same day and revealed mild bilateral nonobstructive plaquing with good antograde flow in

the bilateral vertabral arteries. (Tr. 510-11). On September 2, 2009, Gross underwent a left heart

catheterization, which revealed that Gross suffered from mild to moderate, non-obstructive, one

vessel coronary artery disease with normal left ventricular systolic function. (Tr. 539-40).

   On September 9, 2009, Gross returned for a follow-up visit with Singh. (Tr.

505-06). Singh diagnosed Gross with mild, non-obstructive coronary heart disease and opined

that the atypical chest pains might be related to gastroesophageal reflux disease. (*Id.*). Singh

also noted that Gross's hyperlipidemia was not controlled. (*Id.*). Singh recommended that Gross

discontinue Simvastatin and start taking Crestor for his high cholesterol. (*Id.*). In addition,

Singh prescribed Pantoprazole for Gross's chest pain. (*Id.*).

   On September 14, 2009, Gross went to the emergency room at Strong Memorial

Hospital because of knee pain. (Tr. 573). According to treatment records, Gross reported that he

fell the previous evening.  (*Id.*).  Gross was able to ambulate and to drive himself to the

emergency room.  (*Id.*).  Gross was diagnosed with osteoarthritis in his knee and was instructed

to follow-up with his primary care physician.  (Tr. 583-85, 592-93).

On September 25, 2009, Gross had an appointment with Vantol.  (Tr. 586-87).

Gross reported that he continued to experience depression, but had not been able to see a

psychiatrist through Strong Recovery.  (Tr. 586).  According to Gross, he continued to drink

approximately six beers per day.  (Tr. 587).  Vantol noted that Gross was wearing Neoprene

braces on both knees and recommended a follow-up appointment for knee injections.  (*Id.*).  He

also instructed Gross to slowly discontinue Sertraline and to begin taking Venlafaxine for his

depression.  (*Id.*).  Vantol indicated that she would contact BHS to attempt to facilitate an

appointment with a psychiatrist.  (*Id.*).

Gross also attended alcohol treatment sessions in August and September 2009.

(Tr. 608-625).  The records reflect that Gross began attending group sessions on August 20,

2009.  (Tr. 615).  On September 15, 2009, a treatment plan to address Gross's addiction was

formulated.  (Tr. 615-19).  At the time, Gross was diagnosed with active alcohol and nicotine

dependence and major depressive disorder, and determined to have a Global Assessment of

Functioning ("GAF") of 50.  (Tr. 615).  The treatment plan called for Gross to attend group

sessions three times a week and individual sessions once a month.  (*Id.*).  Gross was eventually

discharged from the program for failing to attend group sessions due to his medical

complications.  (Tr. 612).  At the time of discharge, Gross had attended eleven group sessions

and one individual session.  (Tr. 608).

On April 22, 2010, Gross began treatment with a new primary care physician, Dr. Andrew Davidson ("Davidson") at the University of Rochester Medical Center. (Tr. 654-56). Gross told Davidson that he had obtained a new primary care physician on the advice of his attorney. (Tr. 654). Gross informed Davidson that he had stopped taking his medications due to a loss of insurance coverage approximately three months ago. (*Id.*). The main concerns that Gross discussed with Davidson were knee pain and depression. Gross reported that he was in group therapy at Strong Behavioral Health and that he was currently drinking approximately two beers per day. (*Id.*). In addition, Gross expressed concern regarding "a long standing tremor in his hands." (*Id.*). Davidson referred Gross to an orthopaedic physician to address Gross's ongoing knee pain and noted his intent to contact Strong Behavioral Health to convey Gross's request for more individual therapy sessions. (Tr. 655). Finally, Davidson noted that he would address Gross's hand tremor issues during the next appointment. (Tr. 656).

On May 6, 2010, Gross had an appointment with Mary Jo LaVilla ("LaVilla"), a nurse practitioner in the gastrointestinal clinic. (Tr. 657-59). LaVilla recommended that Gross discontinue use of Alka-Seltzer to treat his gastrointestinal pain and begin using Prevacid. (Tr. 658). In addition, LaVilla scheduled Gross for testing to evaluate whether he suffers from peptic ulcer disease and to rule out colonic neoplasm. (*Id.*).

On May 12, 2010, Gross attended an appointment with Singh. (Tr. 660). Gross reported that he had not experienced chest pains or shortness of breath. (*Id.*). According to Gross, he had experienced increased snoring and difficulty breathing. (*Id.*). Singh referred Gross for a sleep evaluation. (Tr. 661).

On May 19, 2010, Gross had a follow-up appointment and was examined by Ellen Ingram ("Ingram"), a nurse practitioner.  (Tr. 662-63).  Gross reported continued depression and reiterated his request for individual therapy.  (Tr. 662).  Gross reported that he continued to consume one or two alcoholic beverages approximately three times each week.  (*Id.*).  Gross reported continued pain in his legs, knees and back.  (*Id.*).  Upon examination, Ingram noted a potential functional limitation on Gross's left-side and ordered a quad cane to assist Gross's ambulation.  (Tr. 663).

On May 26, 2010, Gross attended an appointment with Dr. Geetanjali Rajda ("Rajda"), a doctor at Sleep Insights, and ultimately underwent a sleep study.  (Tr. 525-34).  The results of the study were evaluated by Dr. Ken Plotkin ("Plotkin").  According to Plotkin, Gross may suffer from obstructive breathing, periodic limb movement disorder and insomnia.  (Tr. 534).

On June 9, 2010, Gross was evaluated by Dr. Allen D. Boyd ("Boyd"), an orthopedic doctor.  (Tr. 664-65).  Boyd reviewed x-rays of Gross's hips and knees and noted no significant abnormalities.  (Tr. 664).  The x-rays of the hips suggested moderate osteoarthritis on the right side and mild osteoarthritis on the left side.  (Tr. 646).  The x-rays of the knees suggested mild bilateral degenerative changes.  (*Id.*).  Boyd opined that Gross's pain symptoms likely stemmed from an issue with his lumbar spine, and he referred Gross to a spine specialist. (*Id.*).

Gross had a follow-up appointment with Ingram on June 29, 2010.  (Tr. 666-67). Ingram noted that Gross continued to experience pain in his back, knees and legs and noted that the orthopedist believed the pain was radiating from the spine and had referred Gross to a

19

specialist.  (Tr. 666).  Ingram also noted that Gross reported continued mood swings and had an appointment scheduled with BHS in August.  (Tr. 666-67).  Ingram advised Gross to continue his medications, attend his upcoming appointments and to follow-up in one month.  (Tr. 667).

On August 12, 2010, Davidson completed a physical RFC assessment questionnaire for Gross.  (Tr. 670-74).  According to Davidson, he had conducted two office visits with Gross during the previous four months.  (*Id.*).  Davidson indicated that Gross suffers from coronary artery disease, morbid obesity, lower back pain and osteoarthritis – all of which were expected to last more than one year.  (*Id.*).  Davidson indicated that Gross suffers pain, fatigue and weakness, including severe pain in his back and legs that is worsened by both activity and inactivity.  (*Id.*).  Davidson opined that he did not believe that Gross was a malingerer and noted that Gross also suffers from depression and anxiety.  (*Id.*).

With respect to employment, Davidson indicated that Gross would frequently experience pain during a typical workday, but would be capable of a low stress job.  (*Id.*).  According to Davidson, he believed that Gross could sit for approximately thirty minutes and stand for approximately five minutes without needing a break.  (*Id.*).  In addition, Davidson believed that Gross would be able to stand or walk for less than two hours in a workday and would be able to sit approximately four hours in a workday.  (*Id.*).  According to Davidson, Gross would need to be able to walk for approximately fifteen minutes every thirty minutes; shift at will from sitting to standing; use an assistive device; take unscheduled breaks continuously throughout the workday; and, elevate his legs by ninety-percent during those breaks.  (*Id.*).  With respect to exertional limitations, Davidson opined that Gross should rarely lift ten pounds or less and should never lift more than ten pounds.  (*Id.*).  According to Davidson, Gross could not

perform any jobs that required any stooping, crouching, squatting or climbing ladders, and should rarely be required to twist or climb stairs.  (*Id.*).  Davidson also indicated that Gross has limitations in reaching, fingering and handling and could only use his hands, fingers and arms twenty-five percent of the workday.  (*Id.*).  Finally, Davidson opined that Gross's impairments would cause him to be absent more than four days per month.  (*Id.*).

IV.     **Proceedings Before the ALJ**

At the administrative hearing, Gross testified that he had not graduated from high school, but had obtained a GED.  (Tr. 52).  He was currently living with his wife and three children.  (*Id.*).  According to Gross, although he had a driver's licence, he could not drive due to drowsiness caused by sleep apnea and medication usage.  (Tr. 34).

Gross testified that he was last employed in March of 2008.  (Tr. 35).  At that time, he was the office manager for a taxi company.  (*Id.*).  According to Gross, he quit his employment after discussions with the company's owner concerning Gross's absences from work.  (*Id*).  Gross testified that he was unable to fulfill his responsibilities and came to a mutual decision with his employer that it would be best if he resigned.  (*Id.*).  Prior to his employment with the taxi company, Gross worked as a truck driver, but stopped because he could not satisfy the heavy lifting requirements.  (Tr. 35-36).  Gross also worked in the food service industry as a cook, a server, and an assistant manager.  (Tr. 36-37).  According to Gross, he could no longer perform any of his previous jobs because of the constant pain he experiences in his back, hips, knees, ankles and legs.  (Tr. 38).

Gross testified that he was receiving treatment from his primary care physician, a cardiologist and a gastroenterologist.  (Tr. 39-40).  Gross testified that he was not currently receiving treatment for his depression, but was on a waiting list at Strong Behavioral Health and hoped to commence treatment soon.  (Tr. 43).  Gross testified that he had attended alcohol counseling at Strong Behavioral Health, but had stopped attending when he lost his insurance coverage.  (Tr. 44).  According to Gross, his new primary care physician, Davidson, did not believe that Gross's current level of alcohol consumption warranted treatment.  (*Id.*).

At the time of the hearing, Gross was taking medications to control his cholesterol, high blood pressure, osteoarthritis and heartburn, as well as muscle relaxants and antidepressants.  (Tr. 40-42).  Gross also testified that he had recently begun taking medication to treat leg problems interfering with his sleep.  (Tr. 43).  According to Gross, the medications for his depression caused drowsiness and difficulty with concentration.  (Tr. 44).  Gross testified that he has difficulty reading a book or watching television because he cannot sustain attention for longer than five to ten minutes.  (Tr. 44, 46-47).  Gross testified that he had attempted physical therapy to address the pain in his back and knees, but that it did not provide any relief.  (Tr. 45). He also testified that he uses a quad cane to assist him in walking and a shower chair.  (*Id.*).

With respect to his alcohol use, Gross testified that before his children were born, he consumed approximately twenty-four beers per day, but that he has reduced his consumption to approximately one to two beers per week.  (Tr. 45-46).  Gross also testified that he smokes cigarettes.  (Tr. 55).

Gross testified that he experiences pain in his lower back, both knees and both ankles.  (Tr. 47).  According to Gross, he experiences pain daily – generally at a level of 7 on a

scale of 1 to 10, and less frequently, perhaps once or twice per week, at a level of 4 or 5.  (*Id.*).

Gross testified that maintaining a static position for any length of time worsens his pain and

activities like walking or lifting also aggravate his pain.  (*Id.*).  Further, Gross testified that he

cannot stoop, squat, kneel, crouch or crawl because he is unable to rise from those positions

without assistance.  (Tr. 48).  According to Gross, his medications do not relieve the pain.  (Tr.

47-48).

Gross testified that his impairments have inhibited his relationships with his

friends and he no longer attends events outside of his home.  (Tr. 48-49).  According to Gross, he

leaves his house to go to his medical appointments and occasionally to go grocery shopping with

his wife.  (Tr. 48).  He sometimes has trouble with those outings because his mood swings can

cause him to cry.  (*Id.*).  Gross testified that he also has difficulty attending events that require

him to sit for an extended period of time or traveling in the car for more than thirty to forty-five

minutes.  (Tr. 51, 55).

Gross testified that he typically wakes four to six times during the night and is

awake for approximately twenty minutes.  (Tr. 49).  According to Gross, he is responsible for

waking his children and getting them ready for school.  (*Id.*).  He usually takes his medication at

9:00 a.m. and needs a nap by 11:00 a.m.  (*Id.*).  Gross testified that he sleeps until approximately

1:30 p.m. and then attempts to fill his time until his wife and children arrive home at 3:00 p.m.

(Tr. 49-50).  Gross testified that he tries to assist with the household chores, but often can

perform a task for only five or ten minutes before needing a break.  (Tr. 51).

With respect to personal hygiene, Gross testified that he requires his cane and

shower chair in the bathroom to assist his stability and movement.  (Tr. 52-53).  In addition, he

needs assistance from his wife to shower approximately fifty percent of the time and requires

assistance from his children to dress twenty to thirty percent of the time. (Tr. 53). According to

Gross, their assistance is necessary because bending and reaching are difficult for him. (*Id.*).

    A vocational expert, Beth Kopar ("Kopar"), also testified during the hearing. (Tr.

56). The ALJ first asked Kopar to identify the exertional levels associated with Gross's previous

employment. (Tr. 57). According to Kopar, with the exception of Gross's employment as a

dispatcher, all of his prior positions required medium exertion. (Tr. 56-57). The ALJ then asked

Kopar whether any of the skills that Gross had acquired in those positions would be transferable

to positions with a light or sedentary exertion level. (Tr. 57-58). According to Kopar, two of the

positions were transferrable to positions with light exertional levels, but none were transferable

to sedentary positions. (Tr. 58). Further, Kopar testified that the skills would not be transferable

if the individual were limited to simple, routine, repetitive tasks. (*Id.*).

    The ALJ then asked whether a person of the same age as Gross, with the same

education and vocational profile, who was limited to a light RFC, and who could only

occasionally climb, balance, stoop, kneel, crouch or crawl, would be able to perform any of the

work that Gross previously performed. (Tr. 59). Kopar opined that such a person, if also limited

to semi-skilled work, could perform Gross's previous jobs as a telemarketer and a dispatcher.

(*Id.*). Further, Kopar opined that if the person were limited to unskilled work, they could not

perform Gross's previous jobs, but would be able perform other regional and national jobs

including ticket seller, laundry folder and order caller. (Tr. 59-61). According to Kopar the

ticket seller position, DOT 211.467-030, had over one million positions in the national economy

and 50,000 positions in New York State. (Tr. 59). Further, Kopar testified that the laundry

folder position, DOT 369.687-018, had over 100,000 positions in the national economy and 200,000 positions in New York State.[5]  (Tr. 60).  Finally, according to Kopar, the order caller position, DOT 209.667-014, had over 500,000 positions in the national economy and 1,000 positions in New York State.  (*Id.*).  The ALJ asked whether those same positions would be available if the person performing them required the ability to sit or stand as needed throughout the day.  (*Id.*).  Kopar testified that based upon her experience, those same positions would be available, but the number would be reduced by half.  (Tr. 60, 64).

The ALJ then asked Kopar whether a person with the above-identified characteristics and limitations would be able to perform those same positions if they also needed to use an assistive device for balance, could not drive and needed to avoid hazards, including heights and machinery.  (*Id.*).  Kopar opined that a person with those limitations would be limited to sedentary work and would not be able to perform either Gross's past work or the three positions that she had identified.  (Tr. 60-61, 63).  However, according to Kopar, such a person could perform the positions of order clerk and telephone quotation clerk, both of which were unskilled, sedentary positions.  (Tr. 61).  According to Kopar, the position of order clerk, DOT 209.567-014, had over 300,000 positions nationwide and 13,000 positions in New York State.  (*Id.*).  The position of telephone quotation clerk, DOT 237.367-046, had over 100,000 positions nationwide and approximately 1,500 positions in New York State.  (Tr. 61-62).

Kopar also testified that for unskilled, entry level positions, employees are typically limited to absences of one-half day per month and permitted two fifteen-minute and one thirty-minute break during the workday.  (Tr. 63).  According to Kopar, an employee who

---

[5]  Obviously, Kopar's testimony was either inaccurate or inaccurately transcribed.

required more breaks or absences, or was repeatedly off task would not be able to maintain

competitive employment.  (*Id.*).

## DISCUSSION

I.   **Standard of Review**

This Court's scope of review is limited to whether the Commissioner's

determination is supported by substantial evidence in the record and whether the Commissioner

applied the correct legal standards.  *See Butts v. Barnhart*, 388 F.3d 377, 384 (2d Cir. 2004)

("[i]n reviewing a final decision of the Commissioner, a district court must determine whether

the correct legal standards were applied and whether substantial evidence supports the decision"),

*reh'g granted in part and denied in part*, 416 F.3d 101 (2d Cir. 2005); *see also Schaal v. Apfel*,

134 F.3d 496, 501 (2d Cir. 1998) ("it is not our function to determine *de novo* whether plaintiff is

disabled[;] . . . [r]ather, we must determine whether the Commissioner's conclusions are

supported by substantial evidence in the record as a whole or are based on an erroneous legal

standard") (internal citation and quotation omitted).  Pursuant to 42 U.S.C. § 405(g), a district

court reviewing the Commissioner's determination to deny disability benefits is directed to

accept the Commissioner's findings of fact unless they are not supported by "substantial

evidence."  *See* 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner . . . as to any fact, if

supported by substantial evidence, shall be conclusive").  Substantial evidence is defined as

"more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept

as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (internal

quotation omitted).

26

To determine whether substantial evidence exists in the record, the court must consider the record as a whole, examining the evidence submitted by both sides, "because an analysis of the substantiality of the evidence must also include that which detracts from its weight." *Williams ex rel Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988). To the extent they are supported by substantial evidence, the Commissioner's findings of fact must be sustained "even where substantial evidence may support the claimant's position and despite the fact that the [c]ourt, had it heard the evidence *de novo*, might have found otherwise." *Matejka v. Barnhart*, 386 F. Supp. 2d 198, 204 (W.D.N.Y. 2005) (citing *Rutherford v. Schweiker*, 685 F.2d 60, 62 (2d Cir. 1982), *cert. denied*, 459 U.S. 1212 (1983)).

A person is disabled for the purposes of SSI and disability benefits if they are unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A) & 1382c(a)(3)(A). When assessing whether a claimant is disabled, the ALJ must employ a five-step sequential analysis. *See Berry v. Schweiker*, 675 F.2d 464, 467 (2d Cir. 1982) (*per curiam*). The five-steps are:

(1)    whether the claimant is currently engaged in substantial gainful activity;

(2)    if not, whether the claimant has any "severe impairment" that "significantly limits [the claimant's] physical or mental ability to do basic work activities";

(3)    if so, whether any of the claimant's severe impairments meets or equals one of the impairments listed in Appendix 1 of Subpart P of Part 404 of the relevant regulations;

> (4)    if not, whether despite the claimant's severe impairments, the claimant retains the residual functional capacity to perform his past work; and
>
> (5)    if not, whether the claimant retains the residual functional capacity to perform any other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520(a)(4)(i)-(v) & 416.920(a)(4)(i)-(v); *Berry v. Schweiker*, 675 F.2d at 467.

"The claimant bears the burden of proving his or her case at steps one through four[;] . . . [a]t step five the burden shifts to the Commissioner to 'show there is other gainful work in the national economy [which] the claimant could perform.'" *Butts v. Barnhart*, 388 F.3d at 383 (quoting *Balsamo v. Chater*, 142 F.3d 75, 80 (2d Cir. 1998)).

A.    **The ALJ's Decision**

In her decision, the ALJ followed the required five-step analysis for evaluating disability claims.  (Tr. 14-22).  Under step one of the process, the ALJ found that Gross had not engaged in substantial gainful activity since March 8, 2009, the alleged onset date.  (Tr. 16).  At step two, the ALJ concluded that Gross has the severe impairments of degenerative disc disease, obesity, hypertension, coronary artery disease, sleep apnea, degenerative joint disease of the right hip and left knee and substance abuse, but that Gross's depression was nonsevere.  (Tr. 17).  At step three, the ALJ determined that Gross does not have an impairment (or combination of impairments) that meets or medically equals one of the listed impairments.  (*Id.*).  At step four, the ALJ concluded that Gross has the RFC to perform sedentary work with certain restrictions. (*Id.*).  Specifically, the ALJ determined that Gross's capacity was limited to simple, routine, and repetitive tasks and that he could only occasionally balance, stoop, kneel, crouch, crawl or climb ramps, stairs, ladders, ropes, or scaffolds and required the ability to sit and stand as needed.  (*Id.*).

In making this assessment, the ALJ considered the effect of Gross's hypertension and obesity on his capacity to work.  (Tr. 19).  Finally, the ALJ determined that Gross was unable to perform past work, but that – considering his age, education, work experience, and RFC – jobs existed in significant number in the national economy that Gross could perform.  (Tr. 20).  Accordingly, the ALJ found that Gross is not disabled.  (Tr. 21).

**B.      Gross's Contentions**

Gross contends that the ALJ's determination that he is not disabled is not supported by substantial evidence and that the ALJ applied the wrong legal standard in assessing Gross's credibility.  (Docket # 12-1).  First, Gross maintains that the ALJ impermissibly failed to conduct a function-by-function analysis of Gross's mental limitations.  (*Id.* at 9-11).  This error was not harmless, Gross maintains, because it caused the ALJ to overlook Gross's workplace limitations.  (*Id.*).  Second, Gross contends that the ALJ's physical RFC assessment was not supported by substantial evidence.  (*Id.* at 11-17).  According to Gross, when conducting the physical RFC assessment, the ALJ impermissibly failed to give controlling weight to the opinion of his treating physician.  (*Id.* at 11-13).  In addition, Gross contends that the ALJ's physical RFC assessment was not supported by any medical opinion, but was improperly based upon her interpretation of medical records that contain no discussion of Gross's functional limitations. (*Id.* at 13-15).  Gross asserts that the error was compounded by the ALJ's failure to make a function-by-function assessment of Gross's exertional limitations.  (*Id.* at 15-17).  Next, Gross argues that the ALJ did not apply the appropriate legal standards in assessing his credibility.  (*Id.* at 17-20).  Finally, Gross contends that the testimony of the vocational expert cannot provide

substantial evidence at step five because it was based upon an RFC that did not fully account for

Gross's limitations.  (*Id.* at 20-21).


## II.   Analysis

### A.   RFC Assessment

An individual's RFC is his or her "maximum remaining ability to do sustained

work activities in an ordinary work setting on a regular and continuing basis." *Melville v. Apfel,*

198 F.3d 45, 52 (2d Cir.1999) (quoting SSR 96–8p, 1996 WL 374184, *2 (July 2, 1996)).  In

making an RFC assessment, the ALJ should consider "a claimant's physical abilities, mental

abilities, symptomology, including pain and other limitations which could interfere with work

activities on a regular and continuing basis." *Pardee v. Astrue*, 631 F. Supp. 2d 200, 221

(N.D.N.Y. 2009) (citing 20 C.F.R. § 404.1545(a)).  "To determine RFC, the ALJ must consider

all the relevant evidence, including medical opinions and facts, physical and mental abilities,

non-severe impairments, and [p]laintiff's subjective evidence of symptoms." *Stanton v. Astrue*,

2009 WL 1940539, *9 (N.D.N.Y. 2009) (citing 20 C.F.R. §§ 404.1545(b)-(e)), *aff'd*, 380

F. App'x 231 (2d Cir. 2010).

Gross challenges the ALJ's physical RFC determination on the grounds that she

failed to give controlling weight to the opinion of his treating physician, Davidson.  (Docket

# 12-1 at 11-13).  According to Gross, his treating physician's opinion is the only medical

opinion of his physical limitations contained in the record.  Thus, Gross maintains, the ALJ's

physical RFC determination is not supported by any medical opinions of record.  (*Id.* at 13-15).

Finally, Gross contends that the ALJ failed to conduct a function-by-function analysis of both his

physical and mental limitations.  (*Id.* at 9-11, 15-17).  This failure, according to Gross, caused the ALJ to overlook his physical inability to sit or stand for extended periods of time and his mental inability to deal with changes in the work setting, use judgment or interact with coworkers or supervisors.  (*Id.*).

### 1.    Medical Opinions of Record

I turn first to Gross's contentions that the ALJ erred by failing to accord Davidson's opinion controlling weight and that, by rejecting Davidson's opinion, the ALJ created a gap in the record that resulted in an RFC assessment unsupported by any opinion from a medical source.

Generally, a treating physician's opinion is entitled to "controlling weight" when it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."  20 C.F.R. § 404.1527(c)(2); *see also Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x 197, 199 (2d Cir. 2010) ("the ALJ [must] give controlling weight to the opinion of the treating physician so long as it is consistent with the other substantial evidence").  "An ALJ who refuses to accord controlling weight to the medical opinion of a treating physician must consider various 'factors' to determine how much weight to give to the opinion."  *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). The ALJ must explicitly consider:

> (1)  the frequency of examination and length, nature, and extent of the treatment relationship,
>
> (2)  the evidence in support of the physician's opinion,
>
> (3)  the consistency of the opinion with the record as a whole,

31

(4)  whether the opinion is from a specialist, and

(5)  whatever other factors tend to support or contradict the opinion.

*Gunter v. Comm'r of Soc. Sec.*, 361 F. App'x at 199.  The regulations also direct that the ALJ should "give good reasons in [her] notice of determination or decision for the weight [she] give[s] [claimant's] treating source's opinion."  *Halloran v. Barnhart*, 362 F.3d at 32 (alterations in original) (quoting 20 C.F.R. § 404.1527(c)(2)).

In her decision, the ALJ accorded "little weight" to Davidson's assessment of Gross's capacity to work on the grounds that Davidson had only two appointments with Gross prior to making his assessment.  (Tr. 20).  In addition, the ALJ concluded that Davidson's opinions regarding Gross's hand, finger and arm limitations were not supported by the record, which only reflected impairments involving Gross's back, hips and knees.  (*Id.*).  Further, although not noted by the ALJ, Davidson's records indicated that Gross commenced treatment with Davidson on the advice of his lawyer.  (Tr. 654).

Judged under relevant caselaw, it is unclear whether Davidson may be considered a treating physician because his assessment indicates that he treated Gross only on two occasions prior to rendering his opinion.  *See Patterson v. Astrue*, 2013 WL 638617, *8 (N.D.N.Y.) ("three examinations by [a physician] over the course of four months . . . does not constitute the type of 'ongoing relationship' that is required for finding that s/he is plaintiff's treating physician under the relevant regulations") (citing 20 C.F.R. §§ 404.1502, 416.902), *report and recommendation adopted*, 2013 WL 592123 (N.D.N.Y. 2013); *Cascio v. Astrue*, 2012 WL 123275, *3 (E.D.N.Y. 2012) (ALJ reasonably determined "that two isolated visits, approximately one year apart, did not

constitute an 'ongoing treatment' relationship rising to the level necessary for [the physician] to qualify as a treating physician"); *Rylee v. Astrue*, 2010 WL 3039602, *7 (S.D. Ala. 2010) ("[t]he treating physician rule does not apply to a physician who bases his opinions of a claimant's limitations on a limited number of visits"); *Seaton v. Astrue*, 2010 WL 2869561, *8 (N.D.N.Y. 2010) ("the ALJ's finding that . . . two visits did not constitute an 'ongoing treatment relationship' is reasonable and shall not be disturbed by this [c]ourt"); *Redmond v. Astrue*, 2009 WL 2383026, *7 (N.D.N.Y. 2009) (finding doctor was not treating physician whose opinion was entitled to controlling weight, noting it "appear[ed] that he only examined [p]laintiff on one occasion"); *Sapienza v. Shalala*, 894 F. Supp. 728, 733 (S.D.N.Y. 1995) ("[t]he administrative record provides substantial support for the ALJ's conclusion that [physician] was not a treating physician[;] [t]he record indicates that [he] had examined [plaintiff] only once").  In addition, treatment notes indicate that Gross switched primary care physicians on the advice of his attorney approximately four months prior to the administrative hearing (Tr. 654), which may undercut the contention that Davidson had an ongoing treatment relationship with Gross at the time of the hearing.  *Austin v. Astrue*, 2010 WL 7865079, *10 (D. Conn. 2010) ("[t]he Commissioner . . . will not find an ongoing treating relationship where the sole source of the medical relationship arises out of a need to obtain a report in support of a disability claim").  In any event, I need not reach the issue of whether the ALJ should have accorded Davidson's opinion controlling weight because I agree with Gross that the ALJ's rejection of Davidson's opinion created an evidentiary gap in the record which requires remand.[6]  *Suide v. Astrue*, 371 F. App'x 684, 689-90 (7th Cir.

---

[6]  Although I do not reach the issue of whether the ALJ provided "good reasons" for the limited weight accorded to Davidson's assessment, I note that the ALJ apparently overlooked at least two treatment notes supporting Davidson's conclusions that Gross may suffer from tremors in his hands.  (Tr. 519, 654).

2010) ("it is not the ALJ's evaluation of [the treating physician's] reports that requires a remand

in this case[;] . . . it is the evidentiary deficit left by the ALJ's rejection of his reports – not the

decision itself – that is troubling"); *see House v. Astrue*, 2013 WL 422058, *4 (N.D.N.Y. 2013)

(ALJ's proper rejection of treating physician opinion nonetheless necessitated remand because

absence of any other medical assessment created evidentiary gap).

      "[A]n ALJ is not qualified to assess a claimant's RFC on the basis of bare medical

findings, and as a result an ALJ's determination of RFC without a medical advisor's assessment

is not supported by substantial evidence." *Dailey v. Astrue*, 2010 WL 4703599, *11 (W.D.N.Y.)

(internal quotation omitted), *report and recommendation adopted*, 2010 WL 4703591 (W.D.N.Y.

2010). Accordingly, "[w]here the medical findings in the record merely diagnose [the]

claimant's exertional impairments and do not relate those diagnoses to specific residual

functional capabilities . . . [,] [the Commissioner] may not make the connection himself." *Deskin*

*v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d 908, 912 (N.D. Ohio 2008) (internal quotation omitted).

Although under certain circumstances, particularly where the medical evidence shows relatively

minor physical impairment, "an ALJ permissibly can render a common sense judgment about

functional capacity even without a physician's assessment," *House v. Astrue*, 2013 WL 422058 at

*4 (internal quotation omitted), I conclude that those circumstances are not present here.

      Without Davidson's opinion, the record is devoid of any opinion from a medical

source assessing Gross's physical limitations. Although there are many treatment notes in the

record, including those from both primary care physicians and specialists, the records generally

contain bare medical findings and do not address or shed light on how Gross's impairments

affect his physical ability to perform work-related functions. Indeed, the only opinion as to

Gross's physical limitations was provided by Sousa, a non-treating, non-examining agency employee who does not qualify as an acceptable medical source. *See Collins v. Astrue*, 2012 WL 2573264, *3 n.5 (W.D.N.Y.) (agency consultant is not an acceptable medical source), *report and recommendation adopted*, 2012 WL 2573261 (W.D.N.Y. 2012); *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 348 n.10 (E.D.N.Y. 2010) (RFC assessment by agency disability analyst not entitled to weight).

After discounting Davidson's opinion, the ALJ determined that Gross retained the physical RFC to perform sedentary work with postural limitations and the ability to sit or stand as needed. (Tr. 17). The ALJ primarily reached this conclusion through her own interpretation of various MRIs and x-ray reports contained in the treatment records. (Tr. 18). Under these circumstances, I conclude that the ALJ's physical RFC assessment is not supported by substantial evidence. *See Suide v. Astrue*, 371 F. App'x at 690 ("[w]hen an ALJ denies benefits, she must build an accurate and logical bridge from the evidence to her conclusion, . . . and she is not allowed to 'play doctor' by using her own lay opinions to fill evidentiary gaps in the record") (internal quotations and citations omitted); *House*, 2013 WL 422058 at *4 ("[b]ecause there is no medical source opinion supporting the ALJ's finding that [plaintiff] can perform sedentary work, the court concludes that the ALJ's RFC determination is without substantial support in the record and remand for further administrative proceedings is appropriate"); *Dailey v. Astrue*, 2010 WL 4703599 at *11 ("[w]ithout this additional medical evidence[,] [the ALJ], as a layperson, could not bridge the gap between plaintiff's [impairments] and the functional limitations that flow from these impairments"); *Walker v. Astrue*, 2010 WL 2629832, *7 (W.D.N.Y.) (same), *report and recommendation adopted*, 2010 WL 2629821 (W.D.N.Y. 2010); *Lawton v. Astrue*, 2009 WL

35

2867905, *16 (N.D.N.Y. 2009) ("[t]he record in this [case] contains no assessment from a

treating source quantifying plaintiff's physical capabilities, and thus there is no basis upon which

the court can find that substantial evidence supports the ALJ's light work RFC determination");

*Deskin v. Comm'r of Soc. Sec.*, 605 F. Supp. 2d at 913 ("a remand is necessary to obtain a proper

medical source opinion to support the ALJ's residual functional capacity finding").

"As a general rule, where the transcript contains only diagnostic evidence and no

opinion from a medical source about functional limitations . . . , to fulfill the responsibility to

develop a complete record, the ALJ must recontact the treating source, order a consultative

examination, or have a medical expert testify at the hearing." *Id.* at 912.  Accordingly, I conclude

that remand is appropriate to allow the ALJ to obtain a physical RFC assessment or medical

source statement from an acceptable medical source concerning Gross's physical capabilities.

### 2.    Function-by-Function Assessments

Gross argues that the ALJ failed to conduct a function-by-function assessment of

his mental capabilities[7] as required by Social Security Ruling 96-8p.  That ruling provides that

"[t]he RFC assessment must first identify the individual's functional limitations or restrictions

and assess his or her work-related abilities on a function-by-function basis . . . .  Only after that

may RFC be expressed in terms of the exertional levels of work."  SSR 96-8p, 1996 WL 374184

at *5.  Such work-related functions include "mental abilities such as understanding,

remembering, carrying out instructions, and responding appropriately to supervision; and other

abilities that may be affected by impairments, such as seeing, hearing, and the ability to tolerate

---

[7] Gross also contends that the ALJ failed to conduct a function-by-function assessment of his physical capabilities.  I need not reach this issue in view of my conclusion that the ALJ's physical RFC assessment is not supported by substantial evidence and must be reevaluated on remand.

environmental factors." *Cichocki v. Astrue*, 729 F.3d 172, 176 (2d Cir. 2013) (*per curiam*)

(citing 20 C.F.R. §§ 404.1545, 416.945; SSR 96-8p, 1996 WL 374184 at *5-6).  The

function-by-function assessment is meant to ensure that the ALJ does not overlook an

individual's particular limitations or restrictions which "could lead to an incorrect use of an

exertional category."  *Id.* (citing SSR 96-8p, 1996 WL 374184 at *4).

       An ALJ's failure to express a claimant's RFC in a function-by-function analysis

does not necessarily mandate remand so long as the RFC is otherwise supported by substantial

evidence.  *Id.* at *4 ("[w]e decline to adopt a *per se* rule[;] . . . [w]here an ALJ's analysis at Step

Four regarding a claimant's functional limitations and restrictions affords an adequate basis for

meaningful judicial review, applies the proper legal standards, and is supported by substantial

evidence such that additional analysis would be unnecessary or superfluous, we agree with our

sister Circuits that remand is not necessary merely because an explicit function-by-function

analysis was not performed"); *Campbell v. Astrue*, 465 F. App'x 4, 6 (2d Cir. 2012) (summary

order) ("while the ALJ did not expressly discuss [claimant's] ability to perform each of the

functions . . . [,] substantial evidence supports the ALJ's overall RFC determination"); *Koch v.*

*Colvin*, 2013 WL 3244789, *5 (W.D.N.Y. 2013) ("district courts in this Circuit are divided

whether [a function-by-function] analysis is required . . . [,] [b]ut the Second Circuit recently

held that such an analysis is unnecessary"); *Murphy v. Astrue*, 2013 WL 1452054, *6 (W.D.N.Y.

2013) (substantial evidence supported RFC assessment and remand was not required "although

the ALJ did not methodically walk through each 'function'"); *Lloyd v. Astrue*, 2013 WL 690499,

*4 (W.D.N.Y. 2013) ("[t]here is no dispute that the ALJ did not conduct an explicit

function-by-function assessment in his decision[,] [b]ut that is not, *ipso facto*, cause for

remand"). Although remand is not automatic, it would be appropriate "where an ALJ fails to assess a claimant's capacity to perform relevant functions, despite contradictory evidence in the record, or where other inadequacies in the ALJ's analysis frustrate meaningful review." *Cichocki v. Astrue*, 729 F.3d at 177.

The ALJ did not conduct a function-by-function analysis of Gross's mental capabilities, but she discussed the medical records and the testimony as they pertained to Gross's mental capabilities. The ALJ noted that despite Gross's allegations of depression, Gross had not received any mental health treatment for depression. (Tr. 16). Further, the ALJ recounted Gross's testimony that he found it difficult to concentrate, but that he was not certain whether his difficulties were attributable to depression or medication. (Tr. 16-17). Finally, the ALJ noted that Gross continued to consume alcohol and had not completed a substance abuse program. (*Id.*). Based upon the absence of medical records reflecting ongoing treatment for depression, the ALJ determined that the evidence did not support a threshold finding that Gross's depression qualified as a medically determinable impairment that significantly limited his ability to perform work-related activities. (Tr. 17). In addition, the ALJ discussed the results of a consultative psychiatric examination conducted by Lambert. (Tr. 16-17, 20). Lambert opined that despite Gross's above-average intellect and significant work and home experience, he likely would have moderate limitations in his ability to maintain a regular schedule, learn new tasks, perform complex tasks independently, relate adequately with others and appropriately deal with stress. (Tr. 475-76).

Gross argues that the ALJ did not make any findings concerning his ability to deal with changes in the work setting, use judgment, or interact with coworkers or supervisors.

38

(Docket # 12-1 at 10-11).  A review of the ALJ's decision belies this contention.  After reviewing

the record evidence, the ALJ concluded that Gross was able to perform simple, routine and

repetitive tasks.  These limitations are consistent with the ALJ's assessment that Gross's

depression was not severe and Gross's testimony that he has difficulty concentrating and

maintaining focus.  (Tr. 23).  Accordingly, although the ALJ did not conduct a

function-by-function assessment, I conclude that the ALJ discussed Gross's mental capabilities

and work-related functions and limitations and that her RFC assessment is supported by

substantial evidence.  *See Carrigan v. Astrue*, 2011 WL 4372651, *7-8 (D. Vt.) (failure to

conduct function-by-function assessment of mental capabilities harmless where ALJ's decision

discussed the claimant's work-related functions and limitations and where substantial evidence

supported RFC assessment), *report and recommendation adopted*, 2011 WL 4372494 (D. Vt.

2011); *see also Moore v. Astrue*, 2013 WL 935855, *7-8 (N.D.N.Y. 2013) (ALJ properly

concluded plaintiff's depression was non-severe where plaintiff "failed to present any medical

evidence demonstrating mental impairments . . . [and thus] failed to establish a colorable

impairment[;] . . . to the extent that any failure to comply with the mechanics of the special

technique could be found, it is harmless error").

### B.    Credibility Assessment

Gross also contends that the ALJ applied the wrong legal standard when assessing

his credibility.  According to Gross, the ALJ's credibility finding must be rejected because it is

improperly based upon a comparison of Gross's statements about his symptoms against the

ALJ's own RFC determination.  (Docket # 12-1 at 18).  Specifically, the ALJ stated, "the

claimant's medically determinable impairments could reasonably be expected to cause the

alleged symptoms; however the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 18). Contrary to Gross's position, an ALJ's use of language such as that quoted above does not automatically mandate reversal. *See*, *e.g.*, *Luther v. Colvin*, 2013 WL 3816540, *7-8 (W.D.N.Y. 2013) (ALJ properly assessed plaintiff's subjective complaints despite language in opinion that the alleged symptoms were inconsistent with her own RFC assessment); *Briscoe v. Astrue*, 892 F. Supp. 2d 567, 585 (S.D.N.Y. 2012) ("[r]ead in context, however, this statement does not indicate that the RFC assessment was a basis for a finding of lack of credibility"). *But see Patterson v. Astrue*, 2013 WL 638617 at *14 (ALJ's credibility analysis flawed where ALJ concluded "that plaintiff's 'statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC] assessment'"). Here, the ALJ specifically stated that she assessed Gross's statements concerning the intensity, persistence and limiting effects of his symptoms "[a]fter careful consideration of the evidence." (Tr. 18).

An ALJ's credibility assessment should reflect a two-step analysis. *Robins v. Astrue*, 2011 WL 2446371, *4 (E.D.N.Y. 2011). First, the ALJ must determine whether the evidence shows that the claimant has a medically determinable impairment or impairments that could produce the relevant symptom. *Id.* (citing 20 C.F.R. 404.1529). Next, the ALJ must evaluate "the intensity, persistence and limiting effects of the symptom, which requires a credibility assessment based on the entire case record." *Id.* (citing 20 C.R.F. § 404.1529(c)). The relevant factors for the ALJ to weigh include: "(1) the claimant's daily activities; (2) the location, duration, frequency and intensity of the claimant's pain or other symptoms;

(3) precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication the claimant takes or has taken to alleviate her pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief of her pain or other symptoms; (6) any measures the claimant uses or has used to relieve her pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms." *Id.* (citing 20 C.F.R. § 404.1529(c)(3)(i)-(vii)).

The ALJ assessed Gross's subjective complaints in the context of a comprehensive review of the entire medical record. In doing so, the ALJ considered evidence relating to the factors identified above and concluded that Gross had been non-compliant with prescribed treatment, including referrals to physical therapy and behavioral health services, continued to smoke and consume alcohol, had failed to complete a substance abuse program and continued to perform some of his activities of daily living. As discussed above, however, the medical evidence is incomplete because it does not contain an assessment by an acceptable medical source of Gross's physical capabilities. On remand, the ALJ should consider whether any additional evidence adduced during the proceedings alters her assessment of Gross's credibility in light of the evidence as a whole. *Larsen v. Astrue*, 2013 WL 3759781, *2 (E.D.N.Y. 2013) ("the [c]ourt notes that to the extent that the ALJ, on remand, reevaluates the evidence . . . , the ALJ should also consider whether that re-evaluation alters the assessment of the plaintiff's credibility in light of the evidence as a whole"). When making this determination, the ALJ should carefully weigh each of the factors set forth in 20 C.F.R. § 416.929(c)(3).

C.    **Vocational Expert Testimony**

Gross contends that the ALJ erred in relying on the vocational expert because the hypothetical posed to the expert was based upon a flawed RFC assessment. Having determined that substantial evidence does not exist to support the ALJ's RFC determination, I likewise determine that "because th[e] RFC determination forms the underpinning of the vocational expert's testimony, the conclusion that there are available jobs that [Gross] is capable of performing is not supported by substantial evidence." *Patterson*, 2013 WL 638617 at *15 (remanding "so that the ALJ may, following a reevaluation of plaintiff's credibility and RFC, again conduct a step-five determination").

III.    **Remand**

"Sentence four of Section 405(g) provides district courts with the authority to affirm, reverse, or modify a decision of the Commissioner 'with or without remanding the cause for a rehearing.'" *Butts*, 388 F.3d at 385 (quoting 42 U.S.C. § 405 (g)). In this matter, I have concluded that remand is warranted because there is an evidentiary gap in the record. Under such circumstances, a remand for further development of the record, as opposed to calculation of benefits, is warranted. *Gibson v. Barnhart*, 212 F. Supp. 2d 180, 183 (W.D.N.Y. 2002) (remand for further development of the record appropriate where a gap in the record existed; "[o]nly where the [c]ourt has no apparent basis to conclude that a more complete record might support the Commissioner's decision may it opt simply to remand for a calculation of benefits"). Accordingly, I conclude that a remand pursuant to sentence four of 42 U.S.C. § 405(g) is

appropriate.  On remand, the Commissioner should obtain an assessment of Gross's physical capabilities from an acceptable medical source.

## CONCLUSION

For the reasons stated above, the Commissioner's motion for judgment on the pleadings **(Docket # 11)** is **DENIED**, and Gross's motion for judgment on the pleadings **(Docket # 12)** is **GRANTED in part and DENIED in part**.  This matter is remanded to the Commissioner for further administrative proceedings consistent with this decision.

**IT IS SO ORDERED.**

_s/Marian W. Payson_

MARIAN W. PAYSON
United States Magistrate Judge

Dated: Rochester, New York
      May __7__, 2014